ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| HÉCTOR COLÓN TORRES<br><br>Parte Apelante<br><br>v.<br><br>AMGEN MANUFACTURING LIMITED<br><br>Parte Apelada | KLAN202300875 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Caso Núm.: HU2021CV01219<br><br>Sala: 208<br><br>Sobre:<br> Discrimen por edad, Represalias, Despido injustificado, Procedimiento sumario |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de octubre de 2023.

Compareció ante este Tribunal la parte apelante, Sr. Héctor Colón Torres (en adelante, "señor Colón Torres" o "Apelante"), mediante recurso de apelación presentado el 2 de octubre de 2023. Nos solicitó la revocación de la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de Humacao (en adelante, el "TPI") el 18 de septiembre de 2023, notificada y archivada en autos el 20 del mismo mes y año. Mediante el referido dictamen, el foro apelado declaró Ha Lugar una solicitud de sentencia sumaria presentada por la parte apelada, Amgen Manufacturing Limited (en adelante, el "Apelado" o "Amgen"), y desestimó la totalidad del pleito, con perjuicio.

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

**I.**

El 9 de noviembre de 2021, el señor Colón Torres presentó una "**Querella**"[1] en contra de Amgen, Compañía ABC, Compañía de Seguro XYZ y Fulano de Tal y Mengana de Tal, por despido injustificado en virtud de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la "Ley Sobre Despidos Injustificados", *infra*, (en adelante, "Ley Núm. 80"). De igual forma, presentó reclamaciones por discrimen en el empleo por razón de edad, conforme a la Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como la "Ley Antidiscrimen de Puerto Rico", *infra*, (en adelante, "Ley Núm. 100") y por represalias conforme la Ley Núm. 115-1991, según enmendada, también conocida como la "Ley de Represalias contra el Empleado por Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial", *infra*, (en adelante, "Ley Núm. 115-1991") y la *Family and Medical Leave Act*, 26 USC 2615 *et seq.*, (en adelante, "FMLA").

Adujo que trabajó con Amgen desde el mes de julio de 2004 hasta su despido el 13 de noviembre de 2020. Expuso que fue despedido por razón de discrimen por edad, al ser relevado de las funciones de "Material Coordinator" nivel III y al reclutar a un empleado más joven en dicha posición. De igual forma, alegó haber sido despedido sin justa causa, luego de presentar ciertas quejas internas en el trabajo sobre sus funciones y deberes relacionados a la posición que mantenía en el trabajo y sobre las presuntas represalias que sufrió por ejercer los derechos reconocidos bajo la FMLA, *supra*, cuando falleció su cónyuge.

En vista de ello, el señor Colón Torres solicitó resarcimiento por los alegados daños sufridos, además de una suma igual consistente a la penalidad, ingresos dejados de devengar, ingresos futuros, reposición en su empleo y todos los demás remedios procedentes conforme a derecho. Asimismo, el Apelante solicitó la concesión de cualquier otro remedio que

---

[1] La "**Querella**" se presentó al amparo del procedimiento sumario establecido en la Ley Núm. 2 del 17 de octubre de 1961, según enmendada, conocida como la "Ley de Procedimientos Sumarios de Reclamaciones Laborales", 32 LPRA sec. 3118 *et seq.*

lo ubique en la misma posición que hubiera estado antes de ocurrir la terminación del empleo.

El 29 de noviembre de 2021, Amgen presentó "**Contestación a Querella**". Mediante la misma, negó la mayoría de las alegaciones contenidas en la "**Querella**" e invocó como defensas afirmativas que el señor Colón Torres fue despedido por justa causa, conforme a las disposiciones de la Ley Núm. 80, *infra*. Expuso que el Apelante fue despedido luego de una investigación interna que reveló que éste ejerció una conducta agresiva y violenta en contra de un empleado temporero del patrono. Adicional a ello, alegó que dicha conducta inapropiada también había sido señalada el 1 de noviembre de 2019, cuando recibió una amonestación de comportamiento luego de un incidente ocurrido entre la Sra. Rosa Claudia, funcionaria del departamento de *Quality Assurance*, y el señor Colón Torres en el que éste se negó a asistir y realizar su trabajo, así como faltarle el respeto a su supervisor frente a otros empleados, impactando negativamente el ambiente de trabajo. Sostuvo que el Apelante había recibido señalamientos sobre su conducta en las evaluaciones de final del año 2018 y 2019, y que dichas conductas cometidas eran altamente impropias y desordenadas, las cuales violentaron los valores de Amgen.

Por otro lado, arguyó que las ausencias cargadas a la FMLA, *supra*, no fueron un factor en ninguna de las decisiones tomadas. Incluso, enfatizó que el señor Colón Torres no se encontraba bajo dicha licencia al momento de ocurridos los hechos. Finalmente, afirmó que la edad del Apelante no fue factor y/o criterio en ninguna de las decisiones tomadas en cuanto a los términos y condiciones de su empleo. En vista de lo anterior, solicitó la desestimación, con perjuicio, de la "**Querella**".

Tras varios incidentes procesales, el 8 de marzo de 2023, Amgen presentó "**Moción de Sentencia Sumaria**". Sostuvo que las reclamaciones del señor Colón Torres no tenían mérito y que la evidencia demostró que el despido estuvo justificado, sin mediar discrimen o represalia alguna. Adujo que es el Apelante quien carga con el peso de probar que su despido

fue injustificado, conforme lo establecido por el Tribunal Supremo en Ortiz Ortiz v. Medtronic, 209 DPR 759 (2022), lo cual fue incapaz de hacer.

Asimismo, el Apelado reiteró las defensas presentadas en su "**Contestación a Querella**" y señaló que el señor Colón Torres fue despedido luego de que surgiera de la investigación realizada que éste incurrió en conducta impropia y desordenada consistente en: (1) conducirse agresiva y violentamente en contra del empleado temporero de agencia, el Sr. Jenaro Mestre (en adelante, "Mestre"), utilizando lenguaje soez; (2) visitar la casa de Mestre fuera del horario laborable con el propósito de pelear con él; (3) expresar públicamente a compañeros de trabajo que visitó la casa de Mestre para pelear y que lo esperaría en el pueblo de Las Piedras para agredirlo con sus puños; (4) llamar por teléfono con posterioridad al incidente en el almacén a Mestre en horas no laborables, con el mismo propósito de incitar a una pelea; y (5) no ser honesto durante la entrevista que le hizo la investigadora interna del Departamento de Relaciones con los Empleados de Amgen, asignada a investigar el incidente que el señor Colón Torres tuvo con Mestre en el trabajo. Todo ello afectando el buen y normal funcionamiento del ambiente de trabajo, en violación a los valores de la compañía y a la reglamentación que rige la conducta de sus empleados, de los cuales el Apelante siempre tuvo conocimiento por ser anualmente adiestrado en torno a ellos.

El 11 de mayo de 2023, el señor Colón Torres presentó la "**Oposición a Solicitud de Sentencia Sumaria**". En síntesis, planteó que existían hechos en controversia que impedían la disposición del caso de autos por la vía sumaria. Para ello, anejó la transcripción que le fuera tomada por Amgen. En específico, el Apelante sostuvo que, aunque su posición era de "Material Coordinator" nivel II, éste realizaba las funciones y deberes de un nivel III. Por lo que, al Amgen contratar a otro empleado más joven para dicha posición, se constituyó discrimen en el empleo por razón de edad. Por otro lado, arguyó que estando bajo la licencia de la FMLA, *supra*, su supervisor le cuestionaba su uso al señalarle las ausencias y tardanzas, además de amonestarlo constantemente. Expuso

que su supervisor incurrió en represalias y que Amgen fabricó un caso en su contra debido a las quejas y el uso de la licencia de la FMLA, *supra*.

Examinadas las mociones presentadas, el 18 de septiembre de 2023, notificada el 20 de mismo mes y año, el foro de instancia declaró Ha Lugar la "**Moción de Sentencia Sumaria**". Concluyó que el despido del señor Colón Torres fue justificado, que Amgen no incurrió en discrimen en el empleo y que eran improcedentes en derecho las reclamaciones de represalia bajo la Ley Núm. 115-1991, *infra*, y bajo la FMLA, *supra*. Por consiguiente, desestimó la "**Querella**" y ordenó su archivo con perjuicio.

Inconforme, el Apelante acudió ante nos mediante el recurso de epígrafe, en el que alegó la comisión de los siguientes errores:

A. ERR[Ó] EL TPI AL DECLARAR CON LUGAR LA SENTENCIA SUMARIA CUANDO EXISTE[N] COTROVERSIAS DE HECHOS MATERIALES QUE AMERITA[N] LA DENEGATORIA DE LA SENTENCIA SUMARIA Y CELEBRACI[Ó]N DE JUICIO EN SU FONDO PARA AQUILATAR LA CREDIBILIDAD Y PESO DE LA PRUEBA[.]

B. ERR[Ó] EL TPI AL DECLARAR CON LUGAR LA SENTENCIA SUMARIA PORQUE INCURRI[Ó] EN ERROR CRASO EN LA APRECIACI[Ó]N DE LA PRUEBA PORQUE EXISTE[N] CONTROVERSIAS DE HECHOS MATERIALES Y CREDIBILIDAD DE TESTIGOS[.]

C. ERR[Ó] EL TPI AL DELCARAR CON LUGAR LA SENTENCIA SUMARIA PORQUE INCURRI[Ó] EN ERROR CRASO EN LA APRECIACI[Ó]N DE LA PRUEBA Y PRIV[Ó] AL APELANTE DEL DEBIDO PROCESO DE LEY CON LA CELEBRACI[Ó]N DEL JUICIO EN SU FONDO PARA CONTRAINTERROGAR A LOS TESTIGOS QUE SOMETIERON DECLARACIONES JURADAS INADMISIBLES[.]

El 24 de octubre de 2023, Amgen presentó "**Alegato en Oposición a Apelación**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El propósito de las Reglas de Procedimiento Civil es proveerles a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1. Así, la Regla 36 del mencionado cuerpo procesal atiende lo referente al mecanismo de sentencia sumaria.

A la luz de sus disposiciones, si de "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y que como cuestión de derecho el tribunal debe dictar la sentencia sumaria a favor de la parte promovente". Regla 36.3 de Procedimiento Civil, 32 LPRA, Ap. V, R. 36.3. En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable". SLG Szendrey-Ramos v. Consejo de Titulares, 184 DPR 133, 167 (2011); Universal Ins. *et als.* v. ELA *et al.*, 2023 TSPR 24, 211 DPR ___ (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente del tribunal.

Solamente se dictará sentencia sumaria en casos en los cuales el tribunal tenga ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Mejías *et al.* v. Carrasquillo *et al.*, 185 DPR 288*,* 299 (2012); PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 DPR 881, 911-912 (1994). Sin embargo, el tribunal no podrá dictar sentencia sumaria cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la Demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material; o (4) la moción no procede como cuestión de derecho. Serrano Picón v. Multinational Life Insurance Company, 2023 TSPR 118, 212 DPR ___ (2023); SLG Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168.

Para prevalecer, el promovente de este recurso debe presentar una moción fundamentada en declaraciones juradas o en cualquier evidencia que demuestre la inexistencia de una controversia sustancial de hechos materiales sobre la totalidad o parte de la reclamación. Roldan Flores v. M. Cuebas *et al.*, 199 DPR 664, 676 (2018).  Por su parte, la parte promovida

por una moción de sentencia sumaria debe demostrar que existe controversia en cuanto a algún hecho material que sea constitutivo de la causa de acción del demandante. Oriental Bank v. Perapi et al., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a que se dicte sentencia sumaria en su contra debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). No puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Roldán Flores v. M. Cuebas *et al.*, *supra*, pág. 677; Ramos Pérez v. Univisión, 178 DPR 200, 214-215 (2010).

Según las directrices pautadas por nuestro más Alto Foro, una vez se presenta la solicitud de sentencia sumaria y su oposición, el tribunal deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente del tribunal; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la demanda que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en un juicio plenario. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se dicte sentencia sumariamente, debe tomarse desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI respecto a una sentencia sumaria, este Foro apelativo se encuentra en la misma posición que el foro de instancia para evaluar su procedencia. Birriel Colón v. Supermercados Los Colobos, 2023 TSPR 120, 213 DPR ___ (2023);

Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020). **La revisión que realice el foro apelativo deberá ser *de novo*,** examinando "el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria y realizando todas las inferencias permisibles a su favor". Birriel Colón v. Supermercados Los Colobos, *supra*. (Énfasis suplido). No obstante, dicha revisión estará limitada solamente a adjudicar los documentos presentados en el foro apelado. Vera v. Bravo, 161 DPR 308, 335 (2004). De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Íd. En adición a esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. Vera v. Dr. Bravo**,** *supra*, págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia sumaria por parte de este foro revisor, el cual consiste de: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

**B.**

Con el fin de proteger el derecho de los empleados a la tenencia de su empleo, la Asamblea Legislativa aprobó la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como la "Ley Sobre Despidos Injustificados", 29 LPRA sec. 185a *et seq.* En nuestro sistema jurídico, el

contrato de servicios que concretiza una relación obrero-patronal se constituye como el medio principal de sustento para los empleados y sus dependientes. Díaz v. Wyndham Hotel Corp., 155 DPR 364, 374 (2001). Debido a ello, existe un interés estatal apremiante para reglamentar las relaciones obrero-patronales, de forma tal que las mismas se enmarquen en una política pública enfocada en salvaguardar los derechos de los trabajadores. Íd. De conformidad con lo anterior, se incorporó en la Ley Núm. 80, *supra*, el requisito de "justa causa" como medida limitativa en toda causa de acción por despido. Por tanto, nuestra jurisprudencia ha establecido que este estatuto siempre debe ser interpretado de la forma más liberal y favorable al empleado. Jusino *et als.* v. Walgreens, 155 DPR 560, 571 (2001).

Así pues, "todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, que sea contratado sin tiempo determinado y trabaje mediante remuneración de alguna clase, tendrá derecho a recibir de su patrono una indemnización cuando sea despedido de su empleo sin que haya mediado justa causa". Ortiz Ortiz v. Medtronic, *supra*, pág. 771. Para ser acreedor del remedio y de los beneficios que instituye la Ley Núm. 80, *supra*, el empleado separado de su cargo debe cumplir con los siguientes requisitos: (1) la existencia de una relación obrero-patronal remunerada; (2) que el empleado haya sido contratado por tiempo indeterminado; y (3) que el empleado haya sido despedido sin que medie justa causa. C. Zeno Santiago y otros, Tratado de Derecho del Trabajo, San Juan, Puerto Rico, Publicaciones JTS, 2003, T. I, pág. 98 (énfasis suplido).

Nótese que nuestro ordenamiento jurídico cobija el poder de dirección empresarial, **al reconocerles a los patronos el derecho de despedir a sus empleados, por cualquier razón no discriminatoria**. Díaz v. Wyndham Hotel Corp., *supra*, pág. 377. Sobre el particular, cabe destacar que las circunstancias que contempla el estatuto en cuanto a lo que se entiende como causa que justifique el despido no son taxativas y que constituye justa causa para el despido aquella que está

vinculada a la ordenada marcha y normal funcionamiento de una empresa. Srio. del Trabajo v. G.P. Inds., Inc., 153 DPR 223, 243 (2001).

En específico, la Ley Núm. 80, *supra*, define justa causa como "aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono". 29 LPRA sec. 185b. Conforme al poder de dirección empresarial y para garantizar el buen funcionamiento de la empresa, nuestro ordenamiento permite que los patronos adopten normas razonables y los reglamentos que entiendan sean necesarios, y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. SLG Torres Álvarez v. Centro de Patología Avanzada, 193 DPR 920, 930-931 (2015); *véase además*, Art. 2 de la Ley Núm. 80, 29 LPRA sec. 185b. Así pues, adicional a las circunstancias establecidas en ley, la violación a las normas o reglamentos adoptados podrían ser motivo justificado para el despido de un trabajador si el patrono prueba que: (1) la violación a los reglamentos es reiterada; (2) las reglas y los reglamentos son razonables; (3) se han suministrado oportunamente copia escrita de estas reglas y estos reglamentos al trabajador, y (4) el despido del empleado no se haga por mero capricho del patrono o sin una razón relacionada con el buen y normal funcionamiento del establecimiento. Feliciano Martes v. Sheraton, 182 DPR 368, 381-382 (2011).

### C.

El Artículo II, de la Sección 1 de la Constitución de Puerto Rico dispone que "[n]o podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana". Art. II, sec. 1, Const. PR. LPRA. Tomo I. En el ámbito del derecho privado, la ley que extiende estos principios al contexto laboral es la Ley Núm. 100 de 30 de junio de 1959, conocida como la "Ley Antidiscrimen de Puerto Rico", 29 LPRA sec. 146 *et seq*. Esta legislación incorpora el lenguaje constitucional y establece responsabilidad civil para aquellos patronos privados que

discriminen en el reclutamiento o en el empleo al crear una causa de acción de daños y perjuicios para el empleado discriminado. Díaz v. Windham Hotel Corp., *supra*, pág. 381.

El Artículo 1 de la Ley Núm. 100 establece que:

Todo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su estatus de empleado, **por razón de edad**, según ésta se define más adelante, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, condición social, afiliación política, o ideas políticas o religiosas, o por ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, o por ser militar, exmilitar, servir o haber servido en las Fuerzas Armadas de los Estados Unidos o por ostentar la condición de veterano del empleado o solicitante de empleo.

    (a)  Incurrirá en responsabilidad civil:

        (1) Por una suma igual al doble del importe de los daños que el acto haya causado al empleado o solicitante de empleo;

        (2) o por una suma no menor de quinientos dólares ($500.00) ni mayor de dos mil dólares ($2,000.00), a discreción del tribunal, si no se pudieren determinar daños pecuniarios;

        (3) o el doble de la cantidad de los daños ocasionados si ésta fuere inferior a la suma de quinientos dólares ($500.00), e

    (b) incurrirá, además, en un delito menos grave y, convicto que fuere, será castigado con multa de hasta cinco mil dólares ($5,000.00), o cárcel por un término no mayor de noventa (90) días, o ambas penas, a discreción del tribunal.

[…]

El tribunal, en la sentencia que dicte en acciones civiles interpuestas bajo las precedentes disposiciones, podrá ordenar al patrono que reponga en su empleo al trabajador y que cese y desista del acto de que se trate. 29 LPRA sec. 146 (énfasis suplido).

Por otro lado, el Artículo 6.2 de la Ley Núm. 4-2017, conocida como la "Ley de Transformación y Flexibilidad Laboral" establece que, para asegurar interpretaciones consistentes, se utilizarán como guía aquello

dispuesto tanto en la legislación y reglamentación federal como en la interpretación judicial federal de aquellas cortes con jurisdicción para adjudicar controversias en Puerto Rico. 29 LPRA sec. 123a. En virtud de dicho artículo, se incorporó, entre otras cosas, el estándar probatorio desarrollado por el Tribunal Supremo de los Estados Unidos, en McDonnell Douglas Corp. v. Green, 411 US 792 (1973), para adjudicar reclamos al amparo de legislación que prohíbe el discrimen bajo el Título VII de la Ley Federal de Derechos Civiles de 1964, 42 USC sec. 2000e *et seq*. *Véase*, Guías para la Interpretación Laboral de la Legislación de Puerto Rico, Departamento del Trabajo y Recursos Humanos, pág. 157 (1era ed. 2019).

Por consiguiente, se eliminó el primer párrafo de Artículo 3 de la Ley Núm. 100 ya que el mismo establecía "una presunción controvertible a favor del empleado que alegaba una violación de ley cuando el acto hubiera sido realizado sin justa causa", resultando ello en la transferencia del peso de la prueba hacia el demandado. Segarra Rivera v. Int'l Shipping *et al*., 208 DPR 964, 988-989 (2022). Actualmente, bajo la doctrina establecida en McDonnell Douglas Corp. v. Green, *supra*, el peso de convencer al juzgador siempre recae en la parte promovente de la acción. Guías para la Interpretación Laboral de la Legislación de Puerto Rico, pág. 157.

El empleado que alega discrimen por edad debe establecer un caso *prima facie* de discrimen en su contra. Para ello, debe "probar unos elementos claves que siembren en la mente del juzgador de hechos la inferencia de que la persona: (1) pertenece a la clase protegida por la legislación; (2) está cualificada para el puesto; (3) fue objeto de una acción adversa; y (4) que se benefició a otra persona que no pertenece al mismo grupo protegido". Guías para la Interpretación Laboral de la Legislación de Puerto Rico, *supra*, pág. 158; Segarra Rivera v. Int'l Shipping *et al*., *supra*, págs. 989-990. Una vez se ha establecido el caso *prima facie* de discrimen, le corresponde al patrono rebatir la presunción de tres maneras, a saber: "(1) derrotar el hecho básico —la ausencia de justa causa—, (2) derrotar el hecho presumido —que el despido fue por causa de motivos discriminatorios— o (3) destruir a la vez el hecho básico y el presumido".

Segarra Rivera v. Int'l Shipping *et al.*, *supra*, pág. 990. Así pues, "la parte demandante deberá refutar la explicación razonable ofrecida por el patrono como cualquier controversia que se tramita en los tribunales. **Es decir, la parte demandante deberá hacer ver que la razón ofrecida es en realidad un subterfugio o pretexto para justificar la acción adversa**". Departamento del Trabajo y Recursos Humanos, *supra*, pág. 158 (énfasis suplido); Joy Goncalves v. Plymouth County Sheriff's Department, 659 F.3d 101, 105 (1st Cir. 2011).

Una vez el patrono demuestre que se despidió a un empleado mediando justa causa, no podrá ser responsable de discrimen al amparo de la Ley Núm. 100, *supra*. Mestres Dosal v. Dosal Escandón, 173 DPR 62, 73 (2008). Nótese que, a la hora de rebatir la presunción de discrimen, el patrono podrá esbozar "una explicación razonable que, de ser creída por el tribunal, sería suficiente para justificar su despido". Segarra Rivera v. Int'l Shipping *et al.*, *supra*, pág. 990.

### D.

La Ley Núm. 115-1991, según enmendada, conocida como la "Ley contra el Despido Injusto o Represalias a todo Empleado para Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial", 29 LPRA sec. 194 *et seq*., fue aprobada con el propósito de proteger a los empleados frente a posibles represalias que pueda tomar un patrono, motivadas por el ofrecimiento de testimonio, expresión o información ante un foro judicial, legislativo o administrativo. Cordero Jiménez v. UPR, 188 DPR 129, 136-137 (2013). En específico, el Artículo 2 (a) del referido estatuto dispone que:

> **Ningún patrono podrá despedir**, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, **así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa**, **o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley**. 29 LPRA sec. 194b (énfasis suplido).

El empleado tendrá dos vías probatorias para establecer su caso: (1) demostrar la violación mediante evidencia directa o circunstancial y demostrar que hubo un nexo causal entre la conducta del demandado y el daño sufrido por el empleado o (2) establecer un caso *prima facie* de violación a la ley, probando que participó en un actividad protegida por el estatuto y que fue subsiguientemente despedido, amenazado o discriminado por el patrono. Rivera Menéndez v. Action Services, 185 DPR 431, 445 (2012). En vista de ello, el trabajador deberá presentar evidencia que establezca:

> (1) que fue tratado de forma distinta a otros empleados; (2) que existió un patrón de conducta antagónica en su contra; (3) que las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias, o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal. Íd.

En fin, el Tribunal Supremo reiteró en Feliciano Martes v. Sheraton Old San Juan, 182 DPR 368 (2011), que al querellante establecer su caso *prima facie*, la Ley Núm. 115-1991, *supra*, crea una presunción *iuris tantum* de violación al referido estatuto a su favor. Íd. pág. 394. Sobre el requisito de nexo causal, el Tribunal Supremo adoptó la tendencia establecida en la jurisdicción federal a los efectos de que se debe demostrar la existencia de suficiente proximidad temporal entre ambos eventos. Íd., págs. 397-398. No obstante, cuando se trate de una acción adversa que no pueda catalogarse como que ocurrió al poco tiempo de la alegada actividad protegida, el empleado tendrá que constatar elementos adicionales que comprueben la existencia de un nexo causal entre estos. Íd., pág. 400. Luego de establecido el caso, el patrono deberá alegar y fundamentar que tuvo una razón legítima y no discriminatoria para el despido. Íd. Ahora bien, el estatuto todavía le reconoce al empleado oportunidad de prevalecer si demuestra que la razón alegada por el patrono es un simple pretexto para el despido discriminatorio. Íd.

**E.**

La *Family and Medical Leave Act*, 26 USC 2615 *et seq*., es una legislación federal que prohíbe a los patronos discriminar y/o tomar

represalias contra empleados por solicitar y/o utilizar una licencia bajo el referido estatuto. Este último, le garantiza a todo empleado elegible:

> [E]l que pueda ausentarse de su empleo —sin paga— por un periodo de doce semanas en el término de un año, ante una enfermedad grave (*serious illness*) que no le permita ejercer sus funciones, o para el cuido de un familiar cercano que se encuentre enfermo, o por el nacimiento —o adopción— y cuido de un nuevo miembro de la familia. SLG Pagán-Renta v. Walgreens, 190 DPR 251, 255 (2014).

Surge de la FMLA, *supra*, que la causa de acción de represalias provee un esquema probatorio similar al establecido en la Ley Núm. 115-1991, *supra*. Entiéndase que, cuando no hay evidencia directa de discrimen y/o represalias, el esquema probatorio aplicable será el establecido por el Tribunal Supremo de los Estados Unidos en McDonnell Douglas, Corp. v. Green, *supra*. En atención a ello, el empleado tiene la carga inicial de presentar evidencia suficiente para establecer un caso *prima facie* de discrimen o represalia. Hodgens v. Generak Dynamics Corp., 144 F.3d 151, 160 (1998) (1er Cir.), citando a McDonnell Douglas, Corp. v. Green, *supra*, pág. 802. Así pues, debe demostrar que: (1) se aprovechó de un derecho protegido bajo la FMLA; (2) fue adversamente afectado por una decisión de empleo; (3) hay un nexo causal entre la actividad protegida del empleado y la acción adversa tomada por el patrono. Hodgens v. Generak Dynamics Corp., *supra*, pág. 161. Si logra establecer su caso, entonces la carga pasa al patrono para que éste demuestre las razones legítimas y no discriminatorias para el despido del empleado, las cuales deben ser suficientes para plantear una cuestión de hecho genuina en cuanto a si discriminó y/o tomó represalias contra el empleado. Íd. pág. 160. Estas razones tienen que ser establecidas mediante evidencia admisible y de ser suficiente para justificar la sentencia a favor del patrono, la presunción de discrimen y/o represalias desaparece, pasando la carga final al demandante para demostrar que la razón provista por el patrono fue un simple pretexto. Íd. págs. 160-161.

**III.**

Por estar íntimamente relacionados los tres (3) señalamientos de error invocados por el Apelante, procedemos a discutirlos en conjunto.

En el caso de autos, el señor Colón Torres alega que no procedía dictar sentencia sumaria, pues aún existían controversias de hechos materiales que ameritaban la celebración de un juicio en su fondo. Sostuvo que el foro de instancia incurrió en error craso en la apreciación de la prueba, además de quedar privado de contrainterrogar a los testigos que sometieron declaraciones juradas inadmisibles. No le asiste la razón.

Es norma claramente establecida en nuestro ordenamiento jurídico que el foro de instancia no podrá dictar sentencia sumaria cuando existan hechos materiales en controversia, cuando alegaciones afirmativas de la demanda no hayan sido refutadas, cuando surja de la prueba documental una controversia real en cuanto a algún hecho material o si como cuestión de derecho, la misma no procede. Ahora bien, quien se oponga a una solicitud de sentencia sumaria no podrá descansar en meras afirmaciones contenidas en sus alegaciones, sino que tendrá que presentar evidencia que demuestre que existen hechos materiales en controversia. Roldán Flores v. M. Cuebas *et al.*, *supra*, pág. 677; Ramos Pérez v. Univisión, *supra*.

Según hemos adelantado, al momento de revisar una determinación del foro de instancia respecto a una sentencia sumaria, estamos llamados a realizar una revisión *de novo* y estamos limitados únicamente a adjudicar los documentos presentados. Realizado dicho análisis, concluimos que el señor Colón Torres no logró controvertir los hechos alegados por Amgen en su "**Moción de Sentencia Sumaria**", los cuales fueron sustentados por documentación acreditativa a esos efectos. En vista de ello, y para propósitos adjudicativos, acogemos como nuestros los hechos incontrovertidos, según fueron desglosados en la *Sentencia* apelada por estar todos sustentados en la prueba documental que obra en los autos. Los mismos leen como sigue:

1. AMGEN, ubicada en Juncos, Puerto Rico, es una subsidiaria de Amgen Inc., es una empresa de Biotecnología que descubre, desarrolla y ofrece terapias humanas innovadoras para tratar enfermedades graves.

2. Durante su empleo en AMGEN el Querellante debía regirse, tanto por el Código de Conducta de AMGEN como

por el Código de Conducta Corporativo conocido como Do The Right Thing.

3. Igual que todos los empleados de AMGEN, el Querellante tenía acceso a ambos Códigos a través del sistema intranet de la Compañía conocido como My Amgen. El Querellante recibió adiestramientos anuales sobre el contenido de ambos.

4. El Código de Conducta requiere que los empleados cooperen plenamente con las investigaciones sobre posibles violaciones al mismo.

5. El Código de Conducta establece que el incumplimiento del mismo por parte de los empleados y/o de las Políticas de la Empresa dará lugar a medidas disciplinarias que podrían incluir el despido.

6. Los empleados de AMGEN deben cumplir con los más altos estándares de conducta profesional, tratar a los demás con respeto, trabajar en equipo, ser éticos, honestos e íntegros, según lo exigen los Valores establecidos por AMGEN. También tienen que cumplir con las Políticas de la Compañía. Son responsables, además, de mantener la buena reputación de la empresa. Con esto en mente, los empleados de AMGEN no pueden involucrarse en conductas o actividades que puedan generar dudas sobre la reputación y orden en las operaciones de AMGEN, o que puedan desacreditar o causar vergüenza para Amgen y/o AMGEN, ya que, en última instancia, otros juzgan a AMGEN en función de cómo los empleados representan sus Valores. Tales Valores eran, entre otros, Confianza y Respeto, Ser Ético y Trabajo en Equipo.

7. El Querellante conocía de tales Valores durante su tiempo de empleo con AMGEN, así como de las expectativas de la Compañía sobre su cumplimiento.

8. El Querellante conocía que el cumplimiento con los Valores de AMGEN era parte importante de las evaluaciones anuales de desempeño de sus empleados y en la evaluación de cualquier solicitud de ascenso de éstos.

9. No conducirse conforme a esos Valores puede tener un impacto negativo en las posibilidades de ascenso de un empleado.

10. Además, AMGEN tiene una política llamada Equal Employment Opportunity, Anti- Discrimination and Anti-Harassment Policy (AMGEN EEO Policy) que prohíbe el discrimen contra sus empleados por clasificaciones protegidas por ley, incluyendo edad. La Política también prohíbe el tomar represalias contra sus empleados por éstos incurrir en actividades protegidas.

11. El Querellante tenía acceso al AMGEN EEO Policy a través del sistema intranet My Amgen y, a la fecha de su despido, tenía conocimiento de sus disposiciones.

12. Las políticas de AMGEN establecen que la Compañía investigará cualquier alegación de discrimen y represalias y tomará medidas correctivas, según corresponda.

13. Los empleados de AMGEN que desean presentar una queja de discrimen y/o represalias pueden hacerlo a través

de varios canales, a saber, poniéndose en contacto con HR Connect (un centro de llamadas de recursos humanos), el Ombudsperson de AMGEN o una línea directa conocida como Business Conduct Hotline, que puede recibir información y quejas anónimas.

14. El Procedimiento de Acciones Disciplinarias de AMGEN establece que las decisiones sobre la consejería y la disciplina a imponerse por la empresa se toman caso a caso, según la naturaleza de la conducta involucrada y su impacto en las operaciones normales de negocio. Por lo tanto, dependiendo de la naturaleza de la violación, se puede omitir el procedimiento general de disciplina progresiva y se puede producir el despido.

15. Querellante tenía acceso y así podía examinar el Procedimiento de Acciones Disciplinarias a través del sistema intranet de la Compañía My Amgen. De tener cualquier duda sobre ella, el Querellante podía acudir a cualquier funcionario de Recursos Humanos de AMGEN.

16. El Querellante, cuya fecha de nacimiento es 31 de octubre de 1969, comenzó a trabajar para AMGEN el 14 de junio de 2004.

17. El Querellante fue reclutado para ocupar la posición de Material Handler II, puesto que luego pasó a llamarse Material Coordinator II. Las funciones de la posición, sin embargo, permanecieron esencialmente inalteradas.

18. En general, dicha posición tiene por responsabilidad primaria recibir, almacenar, despachar, transferir o embarcar materiales conforme procedimientos operacionales estándares (Standard Operating Procedures) en un ambiente regulado por las Buenas Prácticas de la Manufactura (General Manufacturing Practices) emitidas por la Federal and Drug Administration (FDA).

19. A la fecha de su despido, 13 de noviembre de 2020, el Querellante continuaba ocupando esa misma posición de Material Coordinator II o, lo que es igual, Material Coordinator, nivel II.[2] Contaba para entonces con 51 años de edad.

20. El Querellante no tiene preparación académica ni tuvo experiencia de trabajo ni previo a su empleo en AMGEN ni durante su empleo en el ámbito de clasificación de puestos, ni en el de procesos de compensación de empleados; tampoco en procesos de promoción de empleados y criterios a considerar para ello.

21. María ("Margie") Alfonso Delgado ("Alfonso"), Compensation Senior Manager, dirige y dirigió durante el tiempo de empleo de Querellante, la división de Compensación y Beneficios de AMGEN, siendo la persona que tenía la capacitación, conocimiento y experiencia en el área de clasificación de puestos y compensación de empleados de AMGEN. Así lo reconoce Querellante.

---

[2] Ya para esta fecha AMGEN había descontinuado el uso de la nomenclatura de números romanos como parte del título de tal posición, de manera que ésta pasó a titularse Material Coordinator y la que Colón denomina en su "**Querella**" como Material Coordinator III, pasó a titularse Senior Material Coordinator. Se reconoce, no obstante, que muchos empleados continuaron refiriéndose a esas posiciones como, en el caso de la primera, Material Coordinator II o Material Coordinator, nivel II, y en el caso de la segunda, Material Coordinator III o Material Coordinator, nivel III.

22. A partir del año 2019 el supervisor inmediato de Querellante fue Noel Rodríguez ("Rodríguez"), Manager Supply Chain (Gerente del Almacén). El supervisor inmediato de Rodríguez para esa fecha, y en lo sucesivo, inclusive hasta la fecha del despido de Querellante, fue Alex Candelaria ("Candelaria"), Senior Manager Supply Chain (Gerente Senior del Almacén).

23. Rodríguez tenía la responsabilidad de que los trabajos del Almacén se mantuviesen al día y, consistente con ello, que sus supervisados estuviesen al día en el desempeño de sus respectivas tareas.

24. Durante su tiempo de empleo en AMGEN el Querellante fue supervisado por distintos supervisores, entre ellos, Lionel Aguayo (durante los años 2014-2015), Luis David Querellante Torres (durante el año 2016), Lisandra Molina (durante los años 2017-2018) y Rodríguez (durante los años 2019-2020).

25. En las evaluaciones de desempeño del Querellante de los años 2014-2015, realizadas por Lionel Aguayo ("Aguayo"), Querellante obtuvo un rating general de succesfully meets expectations. Aguayo comentó por escrito al Querellante en los formularios de esas evaluaciones, entre otras cosas, que necesitaba mejorar en asegurar la certeza de los inventarios rechazados, tener un nivel de producción sobre el promedio (el Querellante promedió 31%, mientras que el promedio del departamento completo fue un 34%), y tomar los períodos de tomar alimentos dentro del tiempo estipulado.

26. En su evaluación de desempeño del año 2015, el Querellante incluyó un comentario escrito a los efectos de que esperaba "por una aprobación de nivel, ya que llevo realizando una labor de excelencia por más de 12 años y he sido menospreciado". Aguayo le respondió al Querellante en el mismo formulario que las razones por las que no procedía llevarlo al siguiente nivel en la posición que ocupaba; esto es del nivel II (nivel que a esa fecha el Querellante tenía) al nivel III (conocido como Senior Material Coordinator), eran que el nivel III conllevaba "otras responsabilidades aparte de sus tareas asignadas, como tomar la rienda de liderato del turno, repartir el trabajo, ser el eslabón entre el Almacén y los clientes de AMGEN, hacer proyectos especiales, participar en investigaciones de calidad y seguridad y revisar los procedimientos [operacionales]. Entiendo que podemos establecer un plan de acción para brindarte oportunidad de desarrollo".

27. En las evaluaciones de desempeño de los años 2016-2019, el Querellante no volvió a colocar comentario escrito alguno sobre interés en un cambio de nivel a uno superior al que él ostentaba, o en torno a descontento o inconformidad alguna al respecto.

28. En la evaluación del Querellante del año 2016, realizada por Luis David Colón Torres ("Colón Torres"), el Querellante obtuvo un rating general de partially meets expectations, reconocido por el Querellante como uno "bajito" y por debajo del promedio de los demás compañeros de trabajo.

29. Colón Torres comentó al Querellante en esa evaluación que éste necesitaba mejorar ejecutando otras tareas en el área no relacionadas a la destrucción de materiales [desechados], tarea en la que el Querellante mayormente se

concentraba, envolviéndose, por ejemplo, "en tareas diarias como despachos, TOs, cycle counts, etc. y poder realizar más transacciones diarias", y "enfocarse en ejecutar y respetar las directrices impartidas por el team leader del área y asegurar estar alineado a las prioridades" del Almacén.

30. En las evaluaciones del Querellante de los años 2017-2018, ambas realizadas por Lisandra Molina ("Molina"), el Querellante obtuvo un rating de succesfully meets expectations. En la evaluación del 2018, Molina le señaló al Querellante entre otras cosas, que (1) frecuentemente llegaba tarde del período establecido de tomar alimentos; (2) se extendía en el tiempo (se estaba tomando tiempo excesivo) cuando transfería materiales entre los almacenes internos de AMGEN; (3) no obstante tener el conocimiento y destreza para ejecutar sus tareas más rápido, no lo estaba haciendo; (4) necesitaba desarrollar más confianza en sí mismo para aumentar el volumen del procesamiento que realizaba manteniendo calidad de desempeño y la precisión de la data; (5)y sus tardanzas en los ponches de entrada a su turno de trabajo era un área crítica de preocupación, acumulando en tal año más de 120 tardanzas en los ponches de entrada; (6) necesitaba mejorar en el control de su **temperamento**; y (7) aunque su comportamiento era adecuado al lidiar con sus supervisores, la retroalimentación que ella recibía era de que Querellante proveía a sus peers respuestas rápidas y bruscas cuando traían a su atención oportunidades para mejorar o le requerían explicaciones.

31. En la evaluación del Querellante del año 2019, realizada por Rodríguez, el Querellante obtuvo un rating general de partially meetsexpectations. Rodríguez observó que: (1) era a requerimiento al efecto (y no por su propia iniciativa) que el Querellante se mostraba disponible para apoyar las operaciones regulares del Almacén; (2) no obstante tener el conocimiento y destreza para ejecutar sus tareas más rápido, no lo estaba haciendo; (3) necesitaba mejorar en el control de su **temperamento**; (4) la retroalimentación que él estaba recibiendo era que las respuestas que Querellante le daba a sus compañeros de trabajo en ocasiones eran rápidas y bruscas; (5) en ese año 2019 Querellante había incurrido en 88 tardanzas a su turno de trabajo y en 57 penalidades de período de tomar alimentos; y (6) necesitaba desarrollar más confianza en sí mismo o fortalecer su engagement aumentando el volumen de procesamiento de sus tareas mientras mantenía calidad de desempeño.

32. Rodríguez le enfatizó al Querellante por escrito que sus tardanzas y necesidad de desarrollar más confianza en sí mismo y control de su **temperamento** fueron señalamientos que también se le habían hecho en la evaluación anterior.

33. Cuatro supervisores distintos, Aguayo, Colón Torres, Molina y Rodríguez, en evaluaciones de desempeño anuales consecutivas desde el año 2015 al año 2019 le hicieron al Querellante señalamientos escritos similares de áreas a mejorar o de deficiencias en desempeño y comportamientos.

34. En la evaluación del año 2019 Rodríguez también documentó que el 1 de noviembre de 2019 le administró un memorando de comportamientos al Querellante por un incidente que el último suscitó en el Almacén, por lo que tenía que estar consciente de que tenía que cumplir con los Valores de AMGEN siendo ésta una tarea de desempeño importante.

35. En o alrededor de octubre de 2019, el Querellante se presentó a la oficina de Alfonso para dialogar sobre su clasificación de puesto como Material Coordinator II y su deseo de ser reclasificado como Material Coordinator III, o lo que es igual, Senior Material Coordinator o Material Coordinator, nivel II, debido a que, según él, venía ya ejerciendo las funciones del Nivel III de la mencionada posición.

36. Al concluir la reunión Alfonso le solicitó al Querellante que le enviara un detalle de las funciones del Nivel III que el Querellante planteaba estaba ya ejerciendo.

37. El 23 de octubre de 2019, a solicitud de Alfonso, el Querellante envió un correo electrónico a Alfonso en el que le anejó un listado de las funciones que, según el Querellante, eran funciones de Nivel III y él venía ejerciendo.

38. Las funciones identificadas por el Querellante en el documento enviado a Alfonso reflejan funciones consistentes a un Nivel II.

39. El Job Description de la posición Material Coordinator II que el Querellante suscribió indica directamente que, además de las funciones 1-23 que detalla, puede asignársele a tal puesto, y específicamente a él, funciones adicionales. Así lo reconoce el Querellante:

> P A usted se le podían asignar funciones adicionales a las descritas ahí, ¿correcto?
> R Bueno, siempre hay unas tareas adicionales dentro de la Compañía.
> P Exacto.
> R Y uno como empleado, pues, uno en su mayor disposición de cooperar, de ayudar la Compañía, porque yo trabajaba para esa Compañía.

40. A juicio de su supervisor inmediato (Rodríguez), el Querellante carecía de las destrezas y competencias que un Material Coordinator III requiere tener, a diferencia de un Material Coordinator II, a saber: (1) liderato; (2) capacidad de poder asistir, repartir o asistir a los gerentes o a los supervisores de las áreas en distribuir las tareas de trabajo; (3) comunicar instrucciones; (4) asistir en el entrenamiento de empleados nuevos; (5) negociar conflictos o tener la capacidad de poder negociar con los clientes sus diferentes necesidades; y (6) poder comunicarse a todos los niveles; esto es, bajo su nivel y a niveles superiores.

41. Los ascensos en AMGEN no se dan en automático ni por el mero paso del tiempo.

42. El 4 de abril de 2020, Luis Fernández ("Fernández"), Material Coordinator II, fue ascendido al nivel III de dicha posición (Material Coordinator III o Senior Material Coordinator) por solicitud y recomendación de Candelaria.

43. Fernández poseía las destrezas, habilidades y competencias requeridas para asumir tal posición en ascenso. Candelaria justificó al negocio su solicitud y recomendación de ascenso a Fernández destacando esas destrezas, habilidades y competencias que éste tenía como sigue:

> a. ha demostrado el nuevo nivel de contribución que requiere el negocio por su desempeño en el trabajo

constante y continuo, particularmente en el proceso de desecho de materiales, además de una cantidad notable de trabajo y apoyo a sus peers, otros Departamentos de SC y nuestros clientes, especialmente el F&F Operaciones relacionadas con Mfg (AMGEN-14) y Áreas I&P (AMGEN-1).

b. El apoyo a sus compañeros y otros Departamentos son adicionales a sus tareas actuales asignadas y no se consideran parte de sus funciones actuales, pero agregan un alto valor a nuestro negocio.

c. El mayor conocimiento que requiere el negocio se nota fácilmente por la cantidad de funciones y la flexibilidad que Luis puede cumplir específicamente durante la operación de desecho de materiales y la relación y los contactos adquiridos con nuestros proveedores de servicios (Conductores de camiones de remolque, Instalaciones de trituración, Instalaciones de incineración, Escolta de servicios seguridad).

d. Está certificado para trabajar en SC Warehouse, es un conductor de camión certificado de categoría 9, un miembro activo de nuestro ERT y es un usuario competente del sistema ERP. La combinación de conocimientos y experiencia de Luis le permitió demostrar en varias ocasiones sus habilidades para resolver problemas de manera frecuente.

e. Estas demostraciones de habilidades para resolver problemas se pueden apreciar en su participación en investigaciones de discrepancias de inventario, proporcionando materiales para la fabricación e informaciónde almacén para las investigaciones de NC, resolución de problemas del proceso de desecho de materiales y problemas diarios menos técnicos, pero más comunes.

f. Luis ha demostrado la autonomía necesaria para moverse entre su tarea diaria, los procesos en curso y las situaciones inesperadas con una excelente capacidad de priorización. Puede trabajar con supervisión mínima o nula para completar sus funciones, pero siempre informa voluntariamente sobre el progreso del trabajo. Busca el apoyo de la gerencia si es necesario.

g. Con base en la cantidad de deberes y la flexibilidad que Luis puede cumplir, sean parte o no de las responsabilidades de sus funciones actuales, este miembro del equipo está notablemente por encima de sus compañeros de nivel actual.

h. Ha sido identificado por sus compañeros como un recurso de formación de excelencia en cualquiera de las áreas certificadas de Luis, especialmente en Operaciones de Apoyo a Almacenes y Disposición de Materiales.

i. Las habilidades de entrenamiento de Luis son muy apreciadas. Luis está bien organizado y puede desarrollar estrategias para eliminar los obstáculos que ayudan a que las operaciones avancen.

j. Luis es muy respetado por sus compañeros y siempre está abierto a recibir más responsabilidades. El Querellante no conoce los credenciales, destrezas, habilidades ni capacidades que tenía Fernández para ser ascendido a Material Coordinator III, ni las razones de negocio que la Compañía tuvo para, ascenderlo.

44. AMGEN tuvo a la fecha de la comunicación del Querellante a Alfonso, y aún tiene hoy, discreción para establecer los niveles de cada puesto, así como la compensación que cada nivel apareja.

45. El 14 de octubre de 2019, la Especialista de Quality Assurance Rosa Claudio ("Claudio") se presentó al Almacén de AMGEN para inspeccionar el material a descartarse que se encontraba en unas paletas. La inspección consistía en asegurar que la descripción del material a descartarse que contenían las etiquetas colocadas en las paletas coincidiera con el material colocado en las paletas. Claudio debía verificar las etiquetas que se encontraban en la parte posterior (trasera) de las paletas, por lo que le solicitó al Querellante que moviera las paletas para que ella pudiera ver tales etiquetas. El Querellante le expresó a Claudio que esa verificación la había realizado un compañero del almacén y que era suficiente que ella viera las etiquetas que se encontraban en la parte frontal de las paletas.

46. Informado de la situación, Rodríguez llegó al área y llamó por radio al Querellante. Al Rodríguez acercarse al área específica de la inspección, ocurrió una situación entre el Querellante y Rodríguez, que este último percibió como un comportamiento inapropiado e irrespetuoso del Querellante hacia él como su supervisor, y que llevó a Rodríguez a administrarle el Memorando.

47. Rodríguez expresa en el Memorando que en el área de la inspección el Querellante lo cuestionó de forma inapropiada, levantándole la voz y alterado, a oídos de otros supervisados de Rodríguez. Rodríguez expresó en el documento, además, que acto seguido él le manifestó al Querellante que si tenía algo que discutir lo hiciera en la oficina de Rodríguez. Rodríguez señala en el Memorando, además, que el Querellante, de mala manera, procedió entonces a mover las paletas para que Claudio pudiera ver las etiquetas de la parte posterior (trasera) de las mismas.

48. El Memorando advirtió al Querellante que su conducta afectaba negativamente el ambiente de trabajo en el Almacén, no contribuía al trabajo en equipo y que en varias ocasiones anteriores se le había orientado verbalmente de que debía comunicarse con respeto según lo establecen los Valores de AMGEN, y que la expectativa de AMGEN era que modificara la conducta en la acción correctiva señalada y que en lo sucesivo se comunicara con respeto.

49. Para ayudar al Querellante a cumplir tal expectativa, a éste se le requirió revisar, entre otros(as), el folleto de los Valores de AMGEN y el Código de Conducta y completar el adiestramiento del Código de Conducta Do The Right Thing. La acción correctiva le informó al Querellante que de incurrir en una falta adicional de comportamiento contrario a los Valores de AMGEN ello podría acarrear la imposición de otra medida disciplinaria, inclusive el despido, y que la acción correctiva se reflejaría en su evaluación de desempeño del 2019, pudiendo afectar en su compensación y beneficios futuros.

50. El folleto de los Valores de AMGEN y el Código de Conducta se repasaron con el Querellante el 6 de diciembre de 2019 en una reunión que éste sostuvo con Rodríguez y la Gerente de Staff Relations Maricaty Vargas ("Vargas").

51. Como parte de esa reunión Vargas le brindó al querellante un coaching verbal sobre las expectativas de AMGEN en torno al cumplimiento de los comportamientos (valores) establecidos por AMGEN.

52. A raíz del desacuerdo del Querellante con la acción correctiva de 1 de noviembre de 2019, la cual se negó a firmar, AMGEN realizó una investigación interna que asignó a Vargas. Como parte de esa investigación el Querellante fue entrevistado por Vargas. Previo a comenzar la entrevista del Querellante, Vargas le proveyó y explicó a éste los "Requisitos de los Participantes en Investigaciones Internas". Dicho documento requiere que el empleado "cooper[e] plenamente, con absoluta franqueza y respondiendo a todas las preguntas y solicitudes con honestidad".

53. La investigación que Vargas condujo incluyó, además, entrevistas a distintos empleados, incluyendo a Claudio, Rodríguez y Candelaria. Finalizada la investigación Vargas concluyó que Colón había incurrido en la conducta por la cual se le impartió la disciplina. No se validó, de otra parte, lo argumentado por el querellante en el sentido de que el trato de la gerencia de su área de trabajo hacia él "no era el mejor", ni que se le "estuviese persiguiendo por el FMLA que tengo aprobado". Vargas concluyó que la acción correctiva se sostenía.

54. El Querellante disfrutó de una licencia intermitente bajo FMLA desde el 23 de diciembre de 2019 hasta el 22 de junio de 2020. Desde el 23 de junio de 2020 hasta la fecha de su despido el 13 de noviembre de 2020 el Querellante no estuvo acogido a licencia alguna.

55. Previo a ese período de licencia FMLA el Querellante solicitó, le fue aprobada y se acogió a esa misma licencia en varias ocasiones.

56. La licencia de FMLA, así como otras licencias, eran administradas por el Centro de Beneficios de AMGEN a través de Alight. Los supervisores y gerentes de AMGEN, incluido Rodríguez, no tienen participación alguna en el proceso de solicitud, consideración y aprobación de la licencia FMLA. Éstos solo son informados, por correo electrónico, por el propio Centro de Beneficios, que el empleado bajo su supervisión ha solicitado tal licencia y subsiguientemente, de cualquier determinación que el Centro de Beneficios tome en relación con tal solicitud.

57. El propósito de la notificación al gerente, en este caso Rodríguez, es que tenga la oportunidad de evaluar si ante la falta del empleado que se acoge a la licencia hay necesidad de buscar empleados temporeros, mover gente de turno o reajustar la operación para poder ofrecer el servicio y que las unidades operacionales no se afecten o no se detengan.

58. Rodríguez no tomó en consideración las tardanzas de entrada a su turno de trabajo que el Querellante atribuía al uso de licencia intermitente de FMLA para efectos de sus evaluaciones de desempeño. "Eso no se cuenta. De hecho, las ausencias por enfermedad o licencia no se contabilizan como parte de ausencias".

59. El señalamiento de tardanzas y de que el Querellante podía realizar sus tareas en menor tiempo del que consumía

que le hizo al Querellante en su evaluación anual de desempeño 2019 figura igualmente en evaluaciones anuales de desempeño anteriores.

60. El 28 de octubre de 2020 Jenaro Mestre ("Mestre"), empleado temporero asignado a AMGEN por Kelly Services, quien también fungía como Material Coordinator bajo la supervisión de Rodríguez, se personó a la oficina de Rodríguez y reportó un incidente con el Querellante en el Almacén. Mestre alegó a Rodríguez que el Querellante lo amenazó durante una discusión. A raíz de ello, Rodríguez llamó a Candelaria y a Concepción. Candelaria se presentó a la oficina de Rodríguez, y con Concepción al teléfono, esta última procedió a entrevistar a Mestre en torno al incidente. Mestre abundó que el Querellante le expresó que iba a pasar por su casa a golpearlo. Mestre también indicó que entre ellos bromeaban pesado, procediendo a dar como ejemplo el que una vez el Querellante le expresó que Mestre se metía debajo del escritorio de Rodríguez a tener sexo oral con él.

61. Por tratarse la alegada amenaza de un asunto de seguridad, Concepción contactó a Michael Díaz ("Díaz"), Director del Departamento de Seguridad de AMGEN, quien se incorporó, también por teléfono, a la entrevista de Mestre.

62. Díaz le expresó a Mestre, entre otras cosas, que si se sentía amenazado podía optar por recurrir a la Policía Estatal o Municipal, y que si para ello necesitaba su asistencia se lo comunicara para ayudarlo.

63. Aunque Mestre inicialmente expresó no estar interesado en presentar una querella, subsiguientemente visitó el Cuartel de la Policía Estatal de Juncos y radicó contra el Querellante una querella de acecho con fecha de 28 de octubre de 2020.

64. Concluida la entrevista a Mestre, Concepción continuó el proceso de investigación con entrevistas a distintos empleados adicionales, incluidos el propio Querellante, José Marrero ("Marrero") y José Rivera ("Rivera").

65. Estando envuelto un asunto de seguridad, tanto el Querellante como Mestre fueron colocados en una licencia administrativa con paga mientras se completaba la investigación.

66. Según surge de las notas de Concepción de la entrevista hecha a Marrero, entonces Senior Material Coordinator y Group Leader, las cuales tomó mientras conducía la misma, Marrero expresó que el Querellante lo llamó, le mencionó el incidente que él tuvo con Mestre en el Almacén e indicó que estaba esperando a Mestre en el pueblo de Las Piedras dónde Mestre vivía para resolver el asunto entre ellos. Según Marrero, le respondió al Querellante que no sabía lo que había pasado entre ellos el día del incidente, pero que debía pensar mejor las cosas pues pudo ser un malentendido, que el Querellante tenía familia, un niño pequeño y "más mentalidad" que Mestre por sobrepasar los 50 años de edad. Marrero expresó que aconsejó al Querellante a desistir de sus intenciones y que, si quería, hablara con Rodríguez, pero que resolviera las cosas hablando. Añadió que el querellante le manifestó que estaba esperando a Mestre para resolver las cosas como hombre y darle par de puños, y que no le había hecho a Mestre nada en el trabajo porque le podía costar el empleo, su plan médico y sus 17 años de servicio, pero que

la cosa no se quedaría así porque Mestre había jugado con sus habichuelas. Marrero indicó que, en ese momento, le insistió al Querellante que las cosas no se resolvían con violencia y que, además, estar cerca de la casa de Mestre le podía costar legalmente como civil.

67. Rivera, entonces Senior Material Coordinator, por su parte, expresó a Concepción en su entrevista, y así surge de sus notas contemporáneas, que hubo un incidente entre el Querellante y Mestre que se regó por el Almacén en el que se faltaron el respeto y hubo una invitación a pelear. Aunque aclaró que él no presenció el incidente, sí le constaba que el Querellante le manifestó a él y también regó por el Almacén que pasaría por la casa de Mestre para pegarle y que, en efecto, se presentó allí y lo esperó. También, que el Querellante le expresó a él que le envió mensajes de texto a Mestre. Rivera manifestó en su entrevista, además, que muchos de los compañeros de trabajo le llamaron la atención al Querellante por sus expresiones en el Almacén y que los compañeros comentaban que el Querellante estaba loco. Abundó Rivera que en el momento en que el Querellante le expresó a él que fue a la casa de Mestre le preguntó al Querellante por qué había hecho eso y que el Querellante le manifestó que estaba arrepentido y le dijo que se le había ido la mano, que ello le podía costar mucho.

68. En su entrevista, según surge de las notas contemporáneas tomadas por Concepción, el Querellante negó que después de haber ocurrido el incidente con Mestre en el Almacén le hubiese buscado pelea a este último. También negó que hubiese visitado la casa de Mestre para ver si este se encontraba allí y pudieran pelear. Negó, además, que le hubiese dicho a Mestre que se metía debajo del escritorio de Rodríguez a tener sexo oral con él para obtener beneficios. Lo único que admitió fue que, con posterioridad al incidente en el Almacén, llamó por teléfono a Mestre.

69. Finalizada la investigación interna, Concepción les dio credibilidad a los empleados entrevistados, incluidos Marrero y Rivera, concluyendo que, con posterioridad al incidente en el Almacén entre el Querellante y Mestre, el Querellante incurrió en la crasa conducta impropia, desordenada y amenazante que Mestre reportó, y que el Querellante no fue honesto durante su entrevista.

70. Concepción particularmente concluyó que el Querellante amenazó, se condujo agresiva y violentamente en contra de Mestre, usando lenguaje soez, que visitó la casa de Mestre con el propósito de pelear con él, que expresó públicamente a compañeros de trabajo y en el Almacén que visitó la casa de Mestre para ello y que, según le indicó a Marrero, esperaría a Mestre en el pueblo de Las Piedras para agredirlo con sus puños. También, que, igualmente con posterioridad al incidente en el Almacén, llamó al teléfono celular de Mestre en horas no laborales con el mismo propósito de incitar una pelea.

71. Concepción concluyó que el comportamiento del Querellante violó los Valores de AMGEN y que rigen la conducta de los empleados de la Compañía, sobre los cuales el Querellante siempre tuvo conocimiento y recibía adiestramientos anuales.

72. En base a las conclusiones de su investigación, la recomendación de Concepción a Candelaria fue despedir al Querellante. Candelaria acogió la recomendación y se procedió a coordinar la notificación del despido al Querellante.

73. El 13 de noviembre de 2020, mediante llamada telefónica al Querellante con Concepción, Rodríguez y Candelaria, Rodríguez le notificó al Querellante sobre su despido.

74. Como resultado del mismo incidente ocurrido en el Almacén, la agencia de servicios de empleos temporeros Kelly Temporary Services también removió a Mestre de su asignación de trabajo en AMGEN efectivo el 16 de noviembre de 2020.

75. Como parte de la decisión del despido, Candelaria no consideró, ni la edad del Querellante, ni el que éste se hubiese acogido a licencia bajo FMLA, ni el que el Querellante hubiese solicitado ser reclasificado y compensado como Material Coordinator III (Senior Material Coordinator).

76. Candelaria desconocía la edad del Querellante y la de los compañeros de trabajo de éste. No tiene al presente ni tenía entonces acceso a esta información.

77. Alfonso no tuvo participación alguna en la investigación que redundó en el despido del Querellante ni en la decisión de despido.

78. Todos los empleados de AMGEN que se desempeñaban en el Almacén como Material Coordinators II y III, incluyendo a Luis Fernández, con fecha de nacimiento 13 de abril de 1977 y fecha de comienzo en el empleo con AMGEN de 7 de septiembre de 2004, fueron cesanteados en diciembre de 2021 como resultado de un proceso de reorganización que experimentó AMGEN mediante el cual se subcontrató el trabajo que los Material Coordinators realizaban en el Almacén.

79. Rodríguez no conoce ni la edad del Querellante ni la del resto de los compañeros de trabajo del Querellante que él supervisaba.

80. Rodríguez nació el 28 de febrero de 1960.[3]

Tal y como expresamos anteriormente, los patronos tienen la potestad de adoptar normas y reglamentos para garantizar el buen funcionamiento de la empresa, los cuales de ser incumplidos podrían acarrear el despido del empleado mediando justa causa. En este caso, Amgen adoptó el "Código de Conducta de AML" y el código de conducta corporativo conocido como "Do The Right Thing",[4] y proveía adiestramientos anuales sobre el contenido de ambos. En virtud de éstos,

---

[3] *Véase*, Apéndice del recurso, págs. 1,872-1,889 (énfasis suplido).
[4] *Véanse*, Código de Conducta de AML y el código de conducta corporativo, "Do The Right Thing", Anejo 1, Anejo A y B, Apéndice del Apelante, págs. 0079-0126.

se les requiere a los empleados cumplir con los más altos estándares de conducta profesional, tratar a los demás con respeto, trabajar en equipo, ser éticos, honestos e íntegros. Así como no involucrarse en conductas o actividades que pudieran generar dudas sobre la reputación y orden en las operaciones de Amgen o que pudiere desacreditar o causar vergüenza para la compañía.

Establecido lo anterior, surge del expediente ante nuestra consideración que luego del incidente entre el señor Colón Torres y Mestre, Amgen realizó una investigación interna, en la cual se concluyó en que el Apelante incurrió en conductas inapropiadas y desordenadas, como: (1) conducirse agresiva y violentamente en contra de Mestre usando lenguaje soez; (2) visitar la casa de Mestre con el propósito de pelear con él; (3) expresar públicamente a compañeros de trabajo y en el almacén que visitó la casa de su compañero para ello y que lo esperaría en su pueblo para agredirlo con sus puños; (4) llamar por teléfono a Mestre en horas no laborables con el mismo propósito de incitar a una pelea y (5) no ser honesto durante la entrevista que le hizo la investigadora interna del Departamento de Relaciones con los Empleados de Amgen. Todo ello, en violación a los códigos de conducta antes mencionados, los cuales le requerían comportarse con respeto hacia sus compañeros de trabajo, sin mediar violencia o agresión, o amenaza de violencia o agresión, así como actuar con honestidad e integridad en su quehacer labora.

Al señor Colón Torres se le imputa el conocimiento de dichos códigos, pues durante los dieciséis (16) años en que laboró en la compañía recibió los adiestramientos anuales que Amgen proveía. Adicional a que el Apelante tenía acceso directo a los códigos de conducta a través del sistema intranet de la Compañía conocido como "My Amgen", éste había sido notificado sobre los mismos allá para el 1 de noviembre de 2019, cuando recibió un memorando de comportamiento en el cual se le señaló su conducta agresiva e inapropiada. Ello a raíz de un suceso ocurrido entre la señora Claudio, funcionaria de *Quality Assurance* de Amgen, y el señor Colón Torres, así como entre este último y su supervisor. La Apelada, luego

de otra investigación interna, concluyó que dicho comportamiento afectó negativamente el ambiente de trabajo y violentó, a su vez, el código de conducta y valores de la compañía. Inclusive, en dicho memorando se le requirió al Apelante revisar el folleto de valores de Amgen y realizar un adiestramiento del código de conducta "Do The Right Thing". Adicionalmente, se le informó que de incurrir en una falta adicional de comportamiento contrario a los valores de Amgen podría acarrear la imposición de **otra medida disciplinaria, inclusive el despido.** Es a raíz del incumplimiento con los códigos de conducta y los valores de la compañía, los cuales el señor Colón Torres tenía conocimiento propio, que surge la justa causa para su despido.

De igual forma, durante años el señor Colón Torres había recibido señalamientos en sus evaluaciones anuales en cuanto a las deficiencias en su desempeño y comportamiento. En específico, se le indicó que tenía que controlar su temperamento y la forma ruda en la que respondía a solicitudes de trabajo que le realizaban sus compañeros de trabajo. Ante este escenario, y debido al claro incumplimiento con los códigos de conducta, resulta forzoso concluir que el Apelante no logró establecer un caso *prima facie* de discrimen, pues se demostró que el despido del señor Colón Torres estuvo justificado en virtud de la Ley Núm. 80, *supra*. Nótese que Amgen logró establecer, por medio de amplia evidencia documental, que el Apelante se condujo en varias instancias de manera contraria al buen y normal funcionamiento de su antiguo patrono. Asimismo, nos quedó claro que éste incurrió en conducta impropia y/o desordenada y que mostró un desempeño insatisfactorio. Igualmente, se estableció que el señor Colón Torres atentó contra la seguridad de otros empleados, tanto en su área de trabajo como fuera de ésta.

En fin, no estando en controversia la razonabilidad de las reglas y reglamentos que rigen la conducta de los empleados de Amgen, probada la violación de las normas del patrono por parte del Apelante, habiéndosele suministrado copia a este último y quedado demostrado que el despido no ocurrió por capricho o sin razón por parte de Amgen, concluimos que la

respetada juzgadora de instancia no se equivocó al concluir que la terminación del señor Colón Torres fue justificada.

Por otro lado, el Apelante sostuvo que fue despedido discriminatoriamente por razón de su edad. Según hemos adelantado, nuestro ordenamiento requiere que quien promueva este tipo de causa de acción deba demostrar que hubo un despido o una actuación perjudicial y que ésta se llevó a cabo sin justa causa, así como algún hecho que ubique al empleado bajo la modalidad de discrimen por edad. Veamos.

Sobre esta controversia, coincidimos con la apreciación del foro primario al concluir que el mero hecho de que el Apelante tenía 51 años cuando fue despedido, de por sí, no es suficiente para establecer que su edad tuvo algo que ver con su terminación del empleo. Tras evaluar la prueba documental, no encontramos un ápice de prueba tendente a establecer que la edad fue el factor determinante de la acción tomada por el patrono en este caso. De hecho, conforme hemos concluido, se demostró que el despido del señor Colón Torres se basó en razones legalmente válidas y a tono con nuestro estado de derecho. Tampoco se estableció que el Apelante cumplió con las expectativas de Amgen en cuanto a su desempeño se refiere y que fue reemplazado en su puesto de trabajo por una persona de menor edad. Adviértase que el señor Colón Torres nunca ocupó el puesto de "Material Coordinator" nivel III.

No concurren los elementos indispensables para sostener dicha causa de acción. El hecho de que él presuntamente realizara algunas tareas de dicha posición no significa o equivale a que tuviese derecho alguno sobre la misma. Más aún, cuando la prueba arrojó que el desempeño del señor Colón Torres no fue satisfactorio bajo los estándares requeridos por Amgen. Así pues, el mero hecho de que la plaza a la que aspiraba el Apelante fue llenada por una persona más joven, no implica que Amgen incurrió en discrimen por edad.

Incluso, se desprende de la Declaración Jurada del supervisor del señor Colón Torres que éste no cualificaba para una promoción, pues no contaba con las destrezas y competencias necesarias para la posición de

"Material Coordinator" nivel III, tales como: (1) liderato; (2) capacidad de poder asistir, repartir o asistir a los gerentes o a los supervisores de las áreas en distribuir las tareas de trabajo; (3) comunicar instrucciones; (4) asistir en el entrenamiento de empleados nuevos; (5) negociar conflictos o tener la capacidad de poder negociar con los clientes sus diferentes necesidades; y (6) poder comunicarse a todos los niveles; esto es, bajo su nivel y a niveles superiores. Asimismo, el supervisor indicó que el no conducirse conforme a los valores de Amgen podía tener un impacto negativo en la posibilidad de ascenso.[5] En fin, el señor Colón Torres no logró demostrar que fue discriminado por razón de edad. Al contrario, se desprende del expediente que, al momento de la cesantía, no se tomó en consideración su edad, sino su desempeño en la empresa y su comportamiento.

De otra parte, el Apelante arguyó que existe un caso *prima facie* de represalias, pues participó de actividades protegidas como (1) traer a la consideración de Amgen su preocupación de que estaba realizando funciones de "Material Coordinator" nivel III y, por tanto, debía ser reclasificado y remunerado como tal; y (2) haberse acogido a la FMLA. No obstante, tampoco logró demostrar la relación causal entre dichas actividades y su despido en noviembre de 2020, ni rebatió que su terminación se dio por los incidentes violentos en los que se vio involucrado. Así como señaló el foro de instancia, el Apelante se acogió a la licencia de la FMLA en periodos intermitentes desde el 23 de diciembre de 2019 hasta el 22 de junio de 2020. Entiéndase, pasaron cinco (5) meses entre la fecha en que concluyó el periodo de licencia y su eventual despido el 13 de noviembre de 2020, el cual fue motivado por incidentes investigados independientes alrededor de los meses de octubre y noviembre de 2020 que en nada estuvieron relacionados con su interés demostrado para ocupar el puesto de "Material Coordinator" nivel III ni con acogerse a la licencia que provee la FMLA. Por consiguiente, al no demostrarse la existencia del nexo causal, las reclamaciones de

---

[5] *Véase*, Declaración Jurada de Noel Rodríguez, Ap. Anejo 4, pág. 0297.

represalias bajo la Ley Núm. 115-1991, *supra*, como bajo la FMLA resultan improcedentes en derecho.

Finalmente, el Apelante sostiene –escuetamente– que la prueba utilizada por el TPI para arribar a sus conclusiones constituye prueba de referencia inadmisible, pues son "rumores o chismes del pasillo". Alude a que no se cumplió con los requisitos de la Regla 805 (f) de las de Evidencia, 32 LPRA Ap. VI, R. 805 (f), para que la documentación presentada por Amgen fuera considerada una excepción a dicha Regla de exclusión. Arguye a que toda referencia a reportes y/o hojas de trabajo debe estar constatada por una declaración en una vista evidenciaria de un testigo con conocimiento sobre la preparación de dichos documentos. No le asiste la razón.

Tanto de los autos del TPI como del expediente ante nuestra consideración, surgen las declaraciones juradas prestadas por los empleados de Amgen que llevaron a cabo las investigaciones que, posteriormente, provocaron el despido del Apelante. Al revisar las mismas, surge, **bajo juramento**, no solo que ambas tienen conocimiento personal de la información proporcionada, sino que la prueba documental que utilizó el Apelado en su moción de sentencia sumaria fue preparada por dichos empleados contemporáneamente a los hechos y en el curso ordinario de las labores que ejercían para Amgen. Adviértase que la propia Regla 805 (f) de Evidencia, *supra*, que invoca el señor Colón Torres, permite que se presente una certificación que cumpla con la Regla 902 (k) de dicho cuerpo reglamentario, 32 LPRA Ap. VI, R. 902 (K). Al examinar esta última Regla, somos de la opinión de que las declaraciones juradas provistas por el Apelado cumplen, específicamente, con los propósitos que persiguen ambas reglas; imprimirle confiabilidad a prueba que pudiese constituir prueba de referencia inadmisible y, por tanto, una excepción a dicha prueba de exclusión.

De conformidad con lo anterior, de los documentos que surgen del expediente, no hallamos presentado prueba de referencia inadmisible. Los declarantes expusieron hechos que le constaban de propio y personal

conocimiento, puesto a que participaron de procesos relacionados con su labor en la empresa. Adviértase que es norma reiterada que las declaraciones juradas que se presentan junto con una solicitud de sentencia sumaria deben contener hechos que establezcan que el declarante tiene conocimiento personal del asunto declarado.

En suma, debido a que Amgen demostró justa causa para el despido del señor Colón Torres, en virtud de la Ley Núm. 80, *supra*, carece de causa de acción alguna bajo ninguno de los estatutos a los que hemos hecho referencia y, por tanto, procede la confirmación de la *Sentencia* apelada.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones